MR. JUSTICE SHEEHY,
dissenting:
I dissent.
My heart does not bleed with the majority for the captains of industry called Goodyear who were caught in a sticky wicket. Instead, my heart bleeds for a grievously-injured Dennis Kuiper who must return yet again to the courtroom to get just compensation, but this time hobbled in his proof of the malice of these honorable industry captains.
The majority of justices see no relevance in this case in the illegal donation to Nixon’s campaign and the almost immediate dismissal by the Nixon administration of its investigation of the safety of the K-28 rims. The majority wants a smoking gun for proof, ignoring the many times in opinions that each has signed that fraud is almost never subject to direct proof, because the evil that men do is done clandestinely, without record, and that circumstantial evidence is necessary to bring out fraud.
Dennis Kuiper was injured on August 13, 1979. For more than ten years prior to that date, Goodyear was aware that its K-28 rim could come apart explosively, and that the rim posed a danger to the life and limb of any person mounting or dismounting tires thereon. Properly, Dennis Kuiper has sued for punitiveas well as compensatory damages. Punitive or exemplary damages are allowed when the tortfeasor has been guilty of oppression, fraud or malice, actual or presumed, and are given for the sake of example and by way of punishing the tortfeasor. Section 27-1-221, MCA. Therefore, Goodyear’s knowledge that it had a dangerously defective rim, and its efforts to avoid curing that defect or removing the rim from the market over a period of years is an essential part of Kuiper’s proof of malice against Goodyear. The sordid donation by Goodyear to Nixon’s campaign was a part of Goodyear’s malicious effort to keep its defective product on the market and in use in spite of its knowledge of the defect.
*72 The relevance of the Nixon campaign donation by Goodyear is best summarized by the District Court in this case, in denying Goodyear’s motion for new trial:
“. . . A summary of the plaintiffs evidence includes the undisputed fact that Goodyear for many years prior to the investigation of the K rim maintained an offbook account known only by the code name ‘GOYEDA’ in a Swiss bank from which funds were drawn and maintained at Goodyear’s world headquarters in Akron, Ohio for the purpose of making illegal domestic political contributions. Goodyear’s Board Chairman and general counsel participated in cash payments of $40,000 to Maurice Stans, Chairman of the Finance Committee to Reelect the President (FCREEP) in March of 1972 in circumstances which give rise to an inference of attempts to seek political favors. Goodyear became listed on the document known in the Watergate investigation as Rosemary’s List, a record of substantial political contributors maintained by the personal secretary of Richard Nixon. At the time of these contributions there was pending before the National Highway Traffic Safety Commission (NHRSA) a defects investigation involving the Goodyear K rim which is the subject of this suit as well as a Firestone multi-piece rim and proposed rule making which had the potential for limiting or discontinuing production of most multi-piece truck rims. Contemporaneous with the cash payments by Goodyear to ‘FCREEP’ key personnel in charge of these proceedings at ‘NHTSA’ were transferred to other positions and new personnel of questionable qualifications were placed in charge of the proceedings. The defect investigation of the K rim was thereafter discontinued inconsequentially following the Nixon reelection and the appointment of Egil Krogh as Undersecretary of Transportation. In a memorandum of August 15, 1972, Goodyear’s safety vice-president report to the president of Motor Wheel Corporation that he had had a conference with the newly selected chief of the Office of Defects Investigations at the ‘NHTSA’ and was advised that in view of *73 that public official ‘a safety problem exists on these multipiece truck rims, and that he (the public official) would like to handle this problem before it gets any more publicity. Then followed a meeting with the public official several days after the Nixon reelection and the investigation was closed without requiring any recall of the product. Goodyear’s subsequent conduct in attempting to cover up the existence of the investigation and effect of the corporate nature of the contributions is additional evidence that a quid pro quo was intended. The evidence was undisputed that following the revelations of the connection between the Committee to Re-elect the President and the Watergate burglary, the Common Cause litigation forced the disclosure of identity of contributors and as a result Maurice Stans contacted Goodyear general counsel Arden Firestone requesting the names of the contributors on behalf of Goodyear. Instead of disclosing to Stans and to the United States District Court of the District of Columbia that the cash contributions to FCREEP were corporate monies, Firestone met with Russell DeYoung, Goodyear board chairman, and they agreed to submit the names of Goodyear executives who purportedly contributed when in fact they had not given a single penny. This continued effort to cover up through misrepresentation of the identity of the source of the contribution leads to the inference that Goodyear sought a quid pro quoin attempting to avoid public disclosure of the fact. According to DeYoung’s testimony before the Ervin Committee, the videotape which was in evidence, it was only the pressure from Archibald Cox, Watergate Special Prosecutor and the fear of adverse publicity that caused Goodyear to come forward with the admission of a corporate contribution.
“Goodyear and its board chairman Russell DeYoung pleaded guilty to violating the Federal Election Laws with respect to thecontribution. Following the convictions of Goodyear and its board chairman, DeYoung, was subpoenaed before the Ervin Committee on November 15, 1973. *74 At that time DeYoung swore under oath before the Senate of the United States that: ‘at the time the contribution was made, the company was not engaged in any significant litigation with the government and was not aware of any material problems it faced with any branch of the federalgovernment,’ and that the illegal contribution was merely for the good of the country. There was no disclosure of the defects investigation of the Goodyear K multi-piece rim, or the rule making proceedings involving multi-piece rims, which were both pending at the time Goodyear made the illegal payments. The video-tape of the proceedings which was offered by the plaintiff and viewed by the jury not only documented the facts of the payment and denial of the investigations pending, but the jury had the opportunity to judge the demeanor and credibility of the Goodyear board chairman when asked about the reason for the payment and his explanation thereof. Four days following DeYoung’s testimony before the Ervin Committee and denial of the existence of any pending national investigations at the time the payments were made, an internal Goodyear memorandum reported that the same government official who told Goodyear’s safety vice-president that he wanted to handle the matter without publicity was reported to have advised that Goodyear should ‘sit quietly’ with respect to closing of the K rim investigation until the government official advised Goodyear what ‘its next move should be.’ In these circumstances Goodyear’s motions in limine must be denied in that the facts established a submissible jury issue on evidence of an attempt to abort the spirited investigation at the NHTSA as proof of defect in the product. . .”
The District Court’s foregoing summary of the evidence with respect to the campaign donation is brief and correct. The expanded record before us, so lengthy that we cannot incorporate it here in full, and so devastatingly connected to the government’s K-rim investigation in 1972 is so shocking, that no smoking gun is needed. Undoubtedly, Goodyear was buying its protection through the political donation.
*75 Illustrative of the machinations that were going on between Goodyear and the administration officials is the memorandum by its technical manager for product quality and safety addressed to J.F. Hutchison, vice-president of Goodyear, on November 19, 1973:
“J.F. Hutchison, vice-president.
“Subject: Rim investigation Case — 215.
“I have just talked with Andy Detrick [the federal official in charge] this morning relative to the closing of the above case.
“As you know there have been a number of questions raised by Mr. Garbeth as to certain information which we feel should be held out of closed file.
“Mr. Detrick informs me that they have their legal people working on this and we should sit quiet and wait until we hear from Detrick as to what our next move should be. I should add that there is a question in their own minds as to whether or not the information they gleaned from our files in Akron will be kept out or not, and this is the one part that their law people are looking into.”
The rim investigation was closed by the government in December 1973.
In light of the foregoing record, it is interesting to note the testimony of Russel DeYoung, board chairman of Goodyear, before the Ervin Committee on November 15, 1973, when he stated under oath:
“. . . It [the $40,000 contribution] was made solely because we thought the reelection of the president was in the best interest of the country. It was not made with a view to obtaining government favors. Nor was I pressured in any way into making it. Goodyear’s total business with the federal government most of which is obtained at competitive bidding, constitutes less than 3 percent of its sales. At the time the contribution was made the company was not engeged in any significant litigation with the government and was not aware of any material problems it faced with any branch of the federal government. No Goodyear em *76 ployee in charge of government business was aware of the contribution, and there is no indication that any government official was made aware of the contribution.” (Emphasis added.)
DeYoung’s statement that Goodyear was not aware of any material problem it faced with the government is an outright untruth. Its own people estimated that a recall of the rims in use would have cost Goodyear approximately $140 million.
The monstrous extent of the evil that was the Nixon administration is hard for some people to accept. Ten years later, a syndicated columnist finds Nixon merely “unlucky.” Often one hears that Nixon only did what others have done, though his actions are an unparalleled trough in our national ethics. It was expressed in our own conference on this case that Goodyear could not have hoped to “buy out” for a mere $46,000. But Nixon and his coterie were not selling to the highest bidder, they were selling to any bidder. FCREEP agent Maurice Stans had set out with a suitcase full of corporate officials that either wanted to gain government contracts or to avoid adverse regulation. Favorable government consideration, or the hope of it, was the bait. The very nature of Stans’ offer should have alerted the offerees. If they contributed before April 7, 1972, there would be “no record” because of a hole in the law then applicable. Stans’ undertaking was tailor-made for the gullible, the greedy and the crooked. That he would come together with the Goodyear officials was as natural as the meeting of two moles in the dark.
For truth to tell, the men who ran Goodyear in the early 70’s were cheats. They cheated their stockholders by siphoning into a Swiss bank account discounts accruing from European purchases, stealing from company profits by that much. They cheated the I.R.S. by understating company profits, thus increasing taxes for the rest of us. They cheated our election laws and soiled our democracy by illegally coughing up at the command of a corrupt administra *77 tion the cash they had smuggled into our country. They travelled to Washington, D.C. as bagmen, to hand-deliver the illicit lucre like truckling sycophants. Their lawyers now tell this Court that these cheats made their dark, forbidden contributions of stolen money under cover of unlawful secrecy to achieve “good government.” And strange to tell, there are judges who see no dispute for a jury in that. Thieves and brigands, these cheats find a haven in the very institutions they would have torn up by the roots. No whisper of their chicanery in hiding the deathdealing K-rims shall echo in the next District Court. Hidden from the next jury and the fierce light of its scrutiny is the sordid story of venal men who did not give a snap for human safety, for working men like Dennis Kuiper. In the sanitized next trial, the Goodyear blimp will float in pristine blue, far above the wiles and schemes of its ground crew. I know not what other trenchant orders may issue while I sit on this Court, but I pray that someday some grandchild will read and be glad that I had none of this.
There is other manifest error in the majority opinion. It is needless for me to comment on it, as any comment would go unheeded as is this comment. It is enough to say that I would affirm the judgment of the District Court.